# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10079
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2014

Lyle W. Cayce
Clerk

SONJA SHRYER,

Plaintiff - Appellant

v.

UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER AT
DALLAS; LEWIS CALVER; DANIEL K. PODOLOSKY,

Defendants - Appellees

Appeal from the United States States District Court
for the Northern District of Texas
USDC No. 3:12-CV-4270

Before JOLLY, SMITH, and CLEMENT, Circuit Judges..

PER CURIAM:*

Sonja Shryer appeals the district court's grant of summary judgment in favor of the University of Texas Southwestern Medical Center at Dallas ("UT Southwestern") and employees Lewis Calver and Daniel Podolosky on her claims under the Family Medical Leave Act ("FMLA") and Americans with

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10079

Disabilities Act ("ADA"). For the reasons that follow, we AFFIRM the district court's grant of summary judgment.

## I.

Shryer is a former employee of UT Southwestern. She began working in the university's Budget Office in 2001. In 2005, Shryer was diagnosed with Multiple Sclerosis ("MS"). Shryer soon experienced difficulty carrying out her responsibilities in the Budget Office and, after two poor performance reviews, requested to transfer to Southwestern Temps, UT Southwestern's pool for temporary employment within the university. In early 2008, Shryer was given a temporary assignment in the Biomedical Communications Department ("Department"). Her supervisor was Calver, the head of the Department. By the time Shryer began her temporary assignment, she had physical manifestations of MS symptoms, including walking with a cane. In March of 2008, Shryer was hired for a permanent, full-time position in the Department as Education Coordinator.

In July of 2008, Calver gave Shryer her first performance review. She received a score of 3.6 out of 5, falling between the qualitative labels of "consistently meets expectations" and "sometimes exceeds expectations." In her next review in 2009, Shryer's score dropped to a 2.0, indicating that she "sometimes does not meet expectations." Shryer alleges that, when she met with Calver to discuss her review, he asked her if she had a serious medical condition. She recounts that she told Calver she has MS, and that he thereafter "openly expressed his frustration by making repeated comments regarding [her] mobility, or by simply sighing heavily as [she] accomplished [her] tasks."

In early 2010, Shryer applied for jobs outside of the Department, both within and outside of UT Southwestern, but her search was unsuccessful. On September 8, 2010, Shryer met with Ken Bradford, the Director of the Office

of the Dean for the School of Health Professions, in which the Department was located at the time. Bradford informed Shryer that the Department might be closing in the near future. Bradford also discussed the possibility of Shryer's transferring to Southwestern Temps to find employment in another Department within the university, as she had done in 2008. Shryer alleges that Bradford informed her that Calver had complained to him about Shryer's lack of mobility and difficulties performing her job responsibilities. Bradford advised Shryer to ask Calver to raise her latest performance review to a score of 3.0 so that she would be eligible to bid for another position at UT Southwestern in accordance with the university's employee transfer policy.

On September 15, 2010, Shryer met with Regina Jones, a Human Resources Manager at UT Southwestern, to discuss the possibility of transferring to Southwestern Temps. The next day, Shryer approached Calver about the transfer to Southwestern Temps. Calver supported the transfer and Shryer reported to Jones in an email the same day that Calver "wants to make it work out for me." After initially agreeing upon a September 30th transfer date, Calver suggested that Shryer remain in the Department until October 15, 2010, so that the transition would not occur while he was out of the office on vacation. On September 23, 2010, Shryer submitted a request to transfer form to Jones and confirmed that October 15th would be her last day.

Around the time of the transfer discussions, Calver provided Shryer with her 2010 performance evaluation dated September 20, 2010. Calver gave Shryer a score of 2.1, again indicating that she sometimes did not meet expectations. Because Shryer needed a score of 3.0 to transfer to another position, she asked Calver to change her score to a 3.0. Calver complied with her request and issued a revised performance evaluation. On September 24, 2010, Calver provided Shryer with a letter entitled "Acceptance of Resignation." Shryer alleges that during this meeting, Calver told her that her

3

"memory is not good," and remarked that "one of us has got to go, and it's not going to be me." Calver then left for his two-week vacation.

On September 27, 2010, Shryer visited her nurse practitioner. In her patient notes, the nurse practitioner wrote that:

> Sonja says that she mainly wanted to see me today as she is concerned about her job situation. She says that she received a poor performance review because she was chronically late due to transportation problems. She also says she had difficulty managing the website due to her cognitive problems. She would like to transfer jobs within the same organization but cannot because her performance review is so low. She says that she is having difficulty processing what her boss tells her and he has accused her of "being too slow".

> She became very weepy during the visit. She says that she has been to Human Resources and in the past they have offered the option of working as a temp, but she fears losing benefits. She does not really want to do temp work, but she feels that she is in danger of being fired from her job.

Shryer also met with a social worker during her visit, who advised her to take FMLA leave. The next day Shryer requested six weeks of FMLA leave, which UT Southwestern approved.

On September 30, 2010, while on FMLA leave, Shryer emailed Jones regarding the transfer process to Southwestern Temps. On October 11, 2010, Shryer emailed Jones and Mike James—Assistant Vice President of Human Resources—regarding her employment status. Shryer reaffirmed her intent to transfer to Southwestern Temps, but disputed that she had "resigned" from her position as Education Coordinator. Jones and James delayed Shryer's transfer until she returned from FMLA leave and found a temporary assignment, during which time she would retain her employee benefits and full salary. When Shryer returned from FMLA leave on November 8, 2010, she resumed her position as the Department's Education Coordinator.

On December 8, 2010, Shryer was assigned to a full-time, temporary assignment in the university's Parking Services Department. Shryer was informed that the university could not guarantee that she would receive additional full-time work assignments or sufficient part-time work to maintain her benefits eligibility.[1] Shryer attempted to bid on other positions within UT Southwestern during her employment in Parking Services, but was prevented from doing so because there was an "adverse action" in her file. On April 8, 2011, Shryer's temporary assignment in Parking Services ended "due to completion of all available work." Jones told Shryer to contact her weekly to check if temporary work was available, and explained that, if additional work was not found, she would be removed from the payroll in accordance with UT Southwestern policy. Because no temporary assignments became available, Shryer called Jones one month later and asked to be removed from the temporary pool so that she would be eligible for COBRA benefits as a terminated employee.

On November 28, 2011, Shryer filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging disability discrimination and retaliation. Shryer requested and received a right-to-sue letter on July 26, 2012, and filed the instant lawsuit on October 22, 2012. The district court granted summary judgment to defendants on Shryer's interference and retaliation claims under the FMLA and her discrimination claim under the ADA.[2] Shryer timely appealed.

II.

---

[1] Shryer had also received this disclaimer when she entered Southwestern Temps in 2007.

[2] UT Southwestern also moved to dismiss Shryer's claims on the basis of sovereign immunity. Because the district court granted summary judgment to defendants on the merits of Shryer's claims, it dismissed the motion as moot.

No. 14-10079

"We review a grant of summary judgment de novo, applying the same standard as the district court." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "No genuine issue of material fact exists if the summary-judgment evidence is such that no reasonable juror could find in favor of the nonmovant." *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 260 (5th Cir. 2007). To defeat a summary judgment motion, the nonmovant cannot rest on her pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted). A court weighing the motion must interpret all facts and draw all reasonable inferences in favor of the nonmovant. *Ion*, 731 F.3d at 389.

III.

A.

The FMLA provides eligible employees with twelve workweeks of leave during a twelve-month period upon a triggering event, including "a serious health condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). The statute requires an employer to restore an employee who takes FMLA leave to the position she held—or its equivalent—when the leave commenced. *Id.* § 2614(a)(1). The statute also prohibits an employer from retaliating against an employee for taking protected leave. *Id.* 2615(a)(2).

Shryer claims that defendants violated her substantive rights under the FMLA and retaliated against her for taking leave by transferring her to Southwestern Temps one month after she returned to work. These claims are

6

meritless.[3] Shryer requested to be transferred to Southwestern Temps, and Calver agreed to that transfer, *before* she requested FMLA leave. Shryer's appointment with her nurse practitioner, which prompted her decision to take FMLA leave, did not occur until September 27, 2010—one week after her transfer had been solidified. When Shryer took leave, her October 15th transfer date to Southwestern Temps was simply postponed until she returned and could be placed in a full-time temporary position. Further, she reaffirmed her intent to transfer on October 11th, while she was out on FMLA leave. Because Shryer had already arranged for her transfer to Southwestern Temps before she requested FMLA leave, her FMLA claims based on her transfer fail. *See Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 682 (5th Cir. 2013) ("[D]enying reinstatement to an employee whose right to restored employment had *already been extinguished*—for legitimate reasons unrelated to his efforts to secure FMLA leave—does not violate the Act.").

Shryer's retaliation claim based upon her termination from Southwestern Temps also fails. To make out a prima facie case of retaliation, she must, among other things, first establish that she was terminated because she took FMLA leave or that she was treated less favorably than an employee who had not requested leave. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001). She must then show that UT Southwestern's explanation for her termination—that it followed its policy for employees in the temporary pool—is pretext for retaliation. *Id.*

Shryer requested to enter Southwestern Temps and knew that it was the university's policy to remove temporary employees from the payroll if they could not find work within two pay periods. Shryer alleges that she was unable

---

[3] Insofar as Shryer alleges that UT Southwestern interfered with her right to take FMLA leave at all, this claim fails for the obvious reason that she was granted all the leave she requested.

No. 14-10079

to secure additional temporary assignments because of the "adverse action" on her file. But she does not provide any facts suggesting—or even allege—that her inability to apply to additional assignments was linked to her FMLA leave. She also fails to allege or show that other employees were treated more favorably. She has thus failed both to establish a prima facie case of retaliation and to rebut UT Southwestern's non-retaliatory reason for terminating her. The district court properly granted summary judgment to defendants on Shryer's FMLA claims.

### B.

Shryer also alleges that her transfer to Southwestern Temps and ultimate termination were discriminatory under the ADA. As an initial matter, any ADA claim predicated upon her transfer is time-barred. A plaintiff alleging discrimination under the ADA must file her charge with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. § 1217(a); *id.* § 2000e-5(e)(1); *Ramirez v. City of San Antonio*, 312 F.3d 178, 181 (5th Cir. 2002). Because Shryer's transfer occurred on December 8, 2010, and her EEOC complaint was not filed until November 28, 2011, she cannot recover for any alleged damages stemming from the transfer alone.[4]

Shryer's ADA claim based on her removal from Southwestern Temps— her effective termination—also fails. To make out a prima facie claim of disability discrimination, Shryer must show that: "(1) she suffers from a disability; (2) she is qualified for the job; (3) she was subject to an adverse

---

[4] Shryer argues for the first time on appeal that her ADA claim related to her transfer is saved by the continuing violation doctrine. Because she did not make this argument in the district court, it is waived. *See Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 89 (5th Cir. 2011). And, in any case, it is incorrect. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (continuing violation doctrine is not applicable to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire"); *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (applying *Morgan* to ADA claims).

employment action; and (4) she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Milton v. Tex. Dep't of Criminal Justice*, 707 F.3d 570, 573 (5th Cir. 2013) (internal quotation marks and alterations omitted).    If Shryer establishes a prima facie case and defendants provide a non-discriminatory reason for her termination, she must then show that the proffered justification is pretext for discrimination. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).

Defendants argue that Shryer cannot establish a prima facie case or demonstrate pretext because she was removed from Southwestern Temps after failing to secure another temporary assignment in accordance with UT Southwestern policy.    Shryer responds that she was pressured into entering the temporary pool and then prevented from bidding on open positions— eventually forcing her out of the program—because of the "adverse action" demerit, which she alleges was the result of Calver's "false and malicious evaluations."

Insofar as Shryer is alleging that her transfer and eventual removal from UT-Southwestern's payroll together constituted a constructive discharge, her claim fails.    The sum of Shryer's evidence is that Calver gave her poor performance reviews, sighed and occasionally commented on her mobility in her presence, asked if she had a medical condition, and expressed frustration to Bradford that Shryer was not adequately carrying out her responsibilities. Even accepting Shryer's version of the facts, her working condition in the Department does not approach an "intolerable" level that would compel a reasonable employee to transfer or resign.    *See Hunt*, 277 F.3d at 771-72 (listing factors considered in determination of whether a constructive discharge has occurred).  Shryer relies heavily on Calver's purported statement that "one of us has got to go," but she alleges that Calver made the remark *after* she requested the transfer.    It is clear that Shryer feared losing her job,

but she did not ask for a reasonable accommodation or otherwise address her performance issues with Calver. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one."). Shryer instead chose to transfer to Southwestern Temps to find another position in the university as she had done previously. Calver never demonstrated an intention to demote, transfer, or fire Shryer. Tension between an employer and employee is not enough, standing alone, to constitute a constructive discharge.

Shryer also fails to put forth any evidence that her inability to apply for additional full-time or part-time work after her first temporary assignment was the result of disability discrimination. It is unclear why the university deemed Shryer to have an "adverse action" against her, and neither side has produced any evidence on this point.[5] Shryer asks this court to infer that the mark in her file was the result of Calver's "false and malicious" reviews. But contrary to Shryer's assertion that she had no performance issues (and thus that her low evaluations were necessarily the product of discrimination), she admitted to her nurse practitioner that she feared losing her job because she was "chronically late" and "had difficulty managing the website." And even if Calver's evaluations were "malicious," Shryer fails to present any evidence that the adverse action against her was related to her evaluations. Shryer testified that Calver in fact raised her evaluation so that she would be eligible to bid on positions within the university.

---

[5] Shryer testified that she knew about the notice sometime before January 19, 2011 and asked for clarification from several people—including Jones and James—but never received it. She also testified that she called Human Resources and, although someone told her that the prohibition would be removed, it remained in her file until April of 2011 when she left Southwestern Temps.

The only other explanation that Shryer offers for the adverse action is Calver's characterization of her transfer as a resignation. Calver testified that the "Acceptance of Resignation" letter he presented to Shryer was a form letter delivered to him from the Office of Human Resources (the letter included an "xc" notation—or Xerox copy—copying Human Resources). Shryer also stated that she informed Jones and James about the letter and contested that she was resigning. Neither party indicates whether this was standard protocol for an employee leaving a department to enter the temporary pool or an error. But in either case, there is no evidence that labeling Shryer's departure from the Biomedical Communications Department a "resignation"—even if it resulted in the "adverse action" label that prevented her from bidding on assignments—was the product of disability discrimination.

It is undisputed that Shryer approached Calver about a transfer and that Calver raised her performance evaluation to comply with her request. Shryer's attempt to link her inability to bid on additional positions once she entered Southwestern Temps rests on a conspiracy theory. She alleges that: (1) Calver gave her low performance evaluations because of his animus towards her disability; (2) forcing her to look for work outside of his department; (3) leading her to seek advice from Bradford, to whom "Calver [had] expressed his discriminatory plan," and who suggested that she transfer to Southwestern Temps; (4) Calver accepted her transfer and raised her performance evaluation score with the ultimate goal of forcing her out of employment of any kind with UT Southwestern; and (5) Human Resources engaged in a department-wide cover-up to prevent her from discovering the reason for the "adverse action" notation in her file. While an inference may be drawn that the "adverse action" designation was an error, Shryer offers nothing but her own speculation in support of her claim that it was issued because of her disability. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory

statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment."). Shryer does not provide any facts creating a genuine dispute as to defendants' liability under the ADA.

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.